# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| CHANDRA EILAND-HOUSTON ) | |
| ) | |
|     Plaintiff, ) | NO. _____ |
| ) | |
| v. ) | |
| ) | |
| Y.A.P.A. APARTMENT LIVING ) | |
| PROGRAM, INC. d/b/a ) | |
| PROJECT TRANSITION ) | JURY DEMAND |
| ) | |
|     Defendant ) | |

## COMPLAINT

For her Complaint against Defendant Y.A.P.A. Apartment Living Program d/b/a Project Transition ("Defendant" or "Project Transition"), Plaintiff Chandra Eiland-Houston states:

### PARTIES

1. Ms. Eiland-Houston is a citizen and resident of Wilson County, Tennessee. She is a former employee of Defendant.

2. Y.A.P.A. Apartment Living Program, Inc. d/b/a Project Transition is a Pennsylvania Corporation. Project Transition provides services to individuals who are diagnosed with serious mental illness and co-occurring substance use disorders.

3. Project Transition does business within the jurisdiction of this Court and may be served through its registered agent at 800 S. Gay St., Suite 2021, Knoxville, TN 37929.

## JURISDICTION AND VENUE

4. This is an action for damages for unlawful termination of Ms. Eiland-Houston in violation of the Tennessee Public Protection Act, T.C.A. 50-1-304.

5. This Court has jurisdiction under 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391.

## FACTS

6. "No person, partnership, association or corporation *may begin* delivering services until the Department issues a license." *See*, Tennessee Department of Mental Health and Developmental Disabilities Rule 0940-05-02-.03(1).

7. Providing mental health, substance abuse, developmental disability, intellectual disability, or personal support services without a license *is unlawful* and may result in civil and/or criminal sanctions pursuant to T.C.A. §§ 33-2-404, 33-2-407, 33-2-408, 33-2-409, 33-2-412, and 33-2-417." *Id.*

8. T.C.A. 33-2-405 makes it "unlawful for a person, partnership, association or corporation to own or operate a facility that provides mental health, developmental disability, or personal support services" without having obtained a license.

9. Title 33 of the Tennessee Code includes laws and definitions related to mental health, substance abuse, and personal support services applicable to this case, including: T.C.A. §§ 33-1-302, 33-1-303, 33-1-305, 33-1-309, 33-2-301, 33-2-302, 33-2-403, 33-2-404, 33-2-405, 33-2-407, 33-2-408, 33-2-409, 33-2-412, and 33-2-417, 33-2-421, *et seq*. Violation of these laws expose a violating party to civil and/or criminal penalty.

10. Ms. Eiland-Houston was hired by Defendant in or around February 2017.

11. Ms. Eiland-Houston was hired as Defendant's Quality and Credentialing Manager.

12. Ms. Eiland-Houston satisfactorily performed her job duties as a Quality and Credentialing Manager.

13. Ms. Eiland-Houston received solid performance feedback while working for Defendant.

14. Ms. Eiland-Houston did not receive any negative performance feedback or reprimands while working for Defendant prior to the events giving rise to this litigation.

15. Defendant does not claim that Ms. Eiland-Houston's employment ended because of poor job performance, poor attendance, or a policy violation.

16. Among other things, Ms. Eiland-Houston's job duties included: assuring that Project Transition was in legal compliance; assuring that Project Transition's facilities were licensed, up to code, and fully-credentialed; and making efforts to keep Project Transition in compliance with all applicable laws and rules, including those referenced in Paragraphs 6-9 of this Complaint.

17. Defendant leased an apartment at 180 Wallace Road, Apartment G3, Nashville, TN 37211. ("Apartment G3") in 2017.

18. Defendant leased Apartment G3 with plans of applying for licensure that would classify Apartment G3 as a licensed Adult Supported Living Facility (a.k.a. an Adult Supportive Residential Facility) that requires staffing to be present with any members who live in that apartment at all times ("24/7").

19. Around August 23, 2017, Ms. Eiland-Houston submitted an application to have Apartment G3 licensed to the Tennessee Department of Mental Health and Substance Abuse Services ("TDMHSAS").

20. Apartment G3 was vacant at the time Defendant submitted its application for the licensure.

21. Apartment G3 was not a licensed for Adult Supported Living Facility operations as of, on, or before September 7, 2017.

22. Defendant's service-recipients are referred to as "members" by Defendant and its agents.

23. On or about September 7, 2017, Ms. Eiland-Houston was notified by Program Director Benjamin Holmes that Defendant had already started residing members in Apartment G3 before it was licensed for Adult Supported Living Facility services.

24. Plaintiff responded by telling Mr. Holmes that Apartment G3 should not be occupied or operating in an unauthorized capacity pending licensure.

25. Between September 9-10th, the members residing and receiving services in Apartment G3 were moved out of Apartment G3.

26. At some point between September 9th and 29th, Defendant returned members to reside and receive support services in Apartment G3.

27. Defendant did not inform Plaintiff that it decided to return members to Apartment G3 for residence and support services at any point in September 2017.

28. Apartment G3 was not licensed to provide adult supported residential facility services at any point between September 9, 2017 and September 29, 2017.

29. Project Transition failed to assure that Apartment G3 was a safe and secure place for members and neighbors during the time-period where Defendant was housing members in Apartment G3 pre-licensure.

30. The Apartment's Office Manager told Defendant that it was keeping a "running list" of the incidents arising out of Apartment G3.

4

Case 3:17-cv-01513   Document 1   Filed 12/03/17   Page 4 of 13 PageID #: 4

31. Defendant's Director of Facilities Management William Ballentine acknowledges in an email that Defendant **"continued to have complaints"** from the neighbors **"about the noise from Apt G3 and the police activity."**

32. Between September 29, 2017 and October 1, 2017 alone, the Metro Police were called to the apartment at least three (3) times for incidents arising out of Apartment G3.

33. Among the incidents that resulted in police activity at Apartment G3 was an assault of a female services-recipient (member). The female member was assaulted by a person named Gage. This assault occurred on or about Friday, September 29, 2017.

34. The wave of complaints regarding noise and police activity was so significant that Defendant became concerned that it would be evicted from Apartment G3.

35. On October 2, 2017, Director of Facilities Management William Ballentine wrote the following in an email:

> "I would like to bring to everyones attention that we are very close to losing our 24/7 G3 at Nob Hill."

36. Mr. Ballentine's October 2, 2017 email refers to Apartment G3 as "our 24/7."

37. Ms. Eiland-Houston was included as a recipient in Mr. Ballentine's October 2, 2017 email.

38. On October 3, 2017, Program Director Celine Turco responded to Mr. Ballentine's email. Ms. Turco's email states, among other things:

> "I think at this point it is safe to assume we will be evicted and I strongly suggest we start looking for a house setting rather than apartments for the 24/7."

39. Ms. Turco's email references the occupying members of Apartment G3 as "the 24/7."

40. Ms. Eiland-Houston was included as a recipient of Ms. Turco's October 3, 2017 email.

5

41. On Wednesday, October 4, 2017, Ms. Eiland-Houston said the following in an email response:

    > "Nobody should be in G3. Licensing has not yet come out to conduct an inspection nor has the fire marshall."

42. Apartment G3 was not licensed to provide "24/7" services when Ms. Eiland-Houston delivered the email referenced in the previous paragraph.

43. On October 5, 2017, Defendant's Vice President of Operations Kay Mikalic delivered an email to several employees -- including Ms. Eiland-Houston, Mr. Ballentine, and Ms. Turco. The email states, among other things:

    a. "As you are all aware we have submitted to state licensing our intent to license the apartment G3 as a licensed Adult Supported Living Facility that requires staffing at all times be present with any members that live in that apartment";

    b. "<u>No Members</u> can be moved into this apartment until we have final approvals from licensing to move in the Members";

    c. "Please know that going forward form the site visit this facility (G3) will be considered an Adult Supportive Living facility and must be staffed with 24/7 staffing regardless of the level of need or authorization of the individuals who reside in the apartment";

44. Between October 5, 2017 and October 12, 2017, Ms. Eiland-Houston conducted an inspection of Apartment G3. Apartment G3 was not licensed to provide "24/7" services during this period or at any time prior.

45. Ms. Eiland-Houston asked members and staff about: (1) whether members were residing in Apartment G3; and (2) the types of services, if any, that were being provided to the members living in Apartment G3.

46. Ms. Eiland-Houston's inspection and investigation confirmed that Defendant had started delivering 24/7-type services, including medical disbursements and observations, within Apartment G3 without a license.

47. Plaintiff's personal inspection and investigation reasonably led her to conclude that Defendant was engaging in "unlawful operation," in violation of Tennessee law.

48. As of October 12, 2017, Apartment G3 was not licensed.

49. On October 12, 2017, Ms. Eiland-Houston filed a complaint to the Tennessee Department of Mental Health and Substance Abuse Services (TDMHSAS). Her Complaint was supplemented on Friday, October 13, 2017.

50. Ms. Eiland-Houston wrote the following in her Complaint:

> **I am reporting ahead of the licensing inspection of apartment G3 at 180 Wallace Road, Nashville, TN that this apartment is occupied with three members. None have been authorized at a level requiring 24/7 supervision, however Project Transition is staffing the apartment as 24/7. Some programming activities, specifically medication observation, is taking place at this residence."**

51. At 9:04 a.m. on Friday, October 13, 2017, Defendant was notified that a Complaint was filed by Ms. Eiland-Houston. Plaintiff told agents of Defendant:

> **"I conducted an inspection at G3, and I am attaching the results. I would like to reiterate that this group has been notified on at least 3 occasions that service provision, including medication observation and 24-hour staffing, and occupancy should not be occurring in an unlicensed apartment. Because I have learned that both of these things are in fact occurring at this residence, I am obligated to report this information to TDMHSAS division of licensure, which I have done …"**

52. Within an hour of becoming aware that she filed a Complaint related to activities occurring at Apartment G3, Defendant started retaliating against Ms. Eiland-Houston.

53. At approximately 10:00 a.m. on Friday, October 13th, Carrie Carter told Ms. Eiland-Houston to go home because she was "Suspended, Effective Immediately." Defendant made it clear that Plaintiff's suspension was disciplinary in nature.

7

54. Ms. Carter told Ms. Eiland-Houston that the reason she was being suspended is "because [Plaintiff] made a report to TNDMHSAS regarding the unauthorized provision of service at apartment G3 …"

55. Ms. Eiland-Houston was initially told that her suspension would be over on Tuesday, October 17, 2017.

56. As a result of her suspension, Ms. Eiland-Houston went home on the morning of Friday, Oct. 13th.

57. Defendant took additional retaliatory acts against Ms. Eiland-Houston after she was sent home and suspended.

58. For example, Defendant and its agents engaged in aggressive, hostile, and intimidating communications with Plaintiff *after* she notified Defendant of her Complaint. Defendant did not engage in aggressive or antagonistic communications during interactions with Plaintiff *before* her Complaint.

59. On Monday, October 16, 2017, Defendant notified Ms. Eiland-Houston that her suspension time would be extended.

60. Defendant extended Plaintiff's suspension until Friday, October 20, 2017.

61. On Monday, October 16, 2017, Defendant delivered a letter to Ms. Eiland-Houston. The letter contradicted Defendant's earlier statements regarding the reason(s) she was suspended. Defendant now-claimed the suspension was "not disciplinary." Defendant's shifting justification that the suspension was "not disciplinary" is unworthy of credence, false, and pretextual.

62. Additionally, Defendant told Ms. Eiland-Houston to turn over her office keys.

63. Defendant deactivated Ms. Eiland-Houston's facility access badge.

64. Defendant removed Ms. Eiland-Houston's work computer from her workspace.

65. Defendant took Ms. Eiland-Houston work telephone.

66. Defendant removed Ms. Eiland-Houston's access to company electronic medical records.

67. Defendant deactivated Ms. Eiland-Houston's access to her 365 Account.

68. Defendant eliminated Ms. Eiland-Houston's access to SharePoint.

69. Ms. Eiland-Houston was told that if she wanted to remove any personal items from her workspace, she had to contact her supervisor.

70. Defendant took Ms. Eiland-Houston's laptop computer.

71. On Friday, October 20, 2017, Ms. Eiland-Houston tried to return to work.

72. On Friday, October 20, 2017, Plaintiff showed up at the facility for work. When she arrived, Plaintiff observed the full efforts of Defendant to erase her presence at Project Transition.

73. Ms. Eiland-Houston tried to call her supervisor Kay Mikalic. Plaintiff's call was routed to Human Resources and Training Manager Gloria Villafana.

74. Human Resources is involved in employee terminations for Defendant.

75. Based on Defendant's actions since October 13, 2017, Ms. Eiland-Houston told Ms. Villafana that it appeared that Defendant had decided to fire her in response to the Complaint to TDMHSAS.

76. Ms. Villafana never mentioned to Plaintiff that Defendant was not firing her. She never mentioned that Defendant was planning to reactivate and return Plaintiff's work devices and access to employer-systems. Defendant never told Plaintiff that she was welcomed to return to work.

77. Ms. Eiland-Houston asked Ms. Villafana point-blank if she was in fact fired. Ms. Villafana verbally confirmed with an answer of "Yes …" Accordingly, at this point, Plaintiff was fired and Defendant had verbally manifested its intent of the same.

78. Proposed after-the-fact as an "opportunity to save face," Ms. Villafana told Plaintiff that Defendant would permit her to submit a letter of resignation, which would allow her work record to reflect resignation rather than involuntary termination.

79. Plaintiff submitted the letter as suggested by Defendant. The letter nevertheless makes it clear that Plaintiff believed her employment was ending as a result of her Complaint to TDMHSAS, stating: **(a) "After notifying this organization that it was operating outside of acceptable licensure administrative rules, I was obligated to make a report. Upon notifying Project Transition of that report, I experienced and adverse personnel action in the form of a suspension"; (b) "The response at Project Transition to this violation upon my internal report and subsequent willingness to apply a negative personnel consequence for reporting such activities creates an environment that is impossible for me to feel secure in. It also puts my professional reputation at risk and exposes me to personal liabilities; and (c) "I regret these circumstances make it necessary for me to leave abruptly …"**

80. Defendant proposed the offer of resignation to establish as a pretextual smokescreen for its termination or constructive discharge of Plaintiff.

81. Ms. Eiland-Houston was treated differently in the terms, conditions, privileges and benefits of employment than other similarly-situated employees who did not engage in protected activities with regard to alleged illegality of Defendant.

82. Defendant terminated Ms. Eiland-Houston's employment because of her refusal to remain silent about, and refusing to participate in, Defendant's illegal activities (or perceived as illegal with reasonable cause) occurring at Apartment G3.

83. Alternatively, Defendant constructively discharged Ms. Eiland-Houston's employment because of her refusal to remain silent about, and refusing to participate in, Defendant's illegal activities (or perceived as illegal with reasonable cause) occurring at Apartment G3.

84. As a result of Defendant's unlawful actions, Plaintiff has lost income, continued employment, enjoyment of life, and other privileges and benefits of employment.

85. As a result of Defendant's unlawful actions, Ms. Eiland-Houston has suffered embarrassment, humiliation, stress, anxiety, fear, dignitary harm, and incurred attorneys' fees and expenses.

## **CAUSES OF ACTION**

### **VIOLATIONS OF THE TENNESSEE PUBLIC PROTECTION ACT [RETALIATION/WHISTLEBLOWER]**

86. Plaintiff Eiland-Houston incorporates by reference the preceding paragraphs of the Complaint as set forth fully herein.

87. The actions described above constitute retaliation in violation of the TPPA for her refusal to remain silent and/or refusal to participate in illegal activity that was being performed by Ms. Eiland-Houston's employer, Project Transition.

88. Plaintiff Eiland-Houston engaged in the protected activities of reporting, internally and externally, that Defendant was engaged in illegal and unauthorized operations and service providing at Apartment G3.

89. The act complained about is illegal, and in violation of Tennessee law.

90. In retaliation for Plaintiff's election to speak out about and/or refusal to participate in the continued illegality (or act reasonably believed to be unlawful), Defendant took multiple adverse employment actions against Ms. Eiland-Houston – including firing her and/or constructively discharging her.

91. Defendant's actions following Plaintiff's protected conduct were committed with reckless disregard to her rights.

92. Defendant's actions against Ms. Eiland-Houston caused her to suffer both monetary and nonmonetary damages.

93. Thus, Plaintiff is entitled to an award of back pay and benefits, compensatory and punitive damages, injunctive relief, attorneys' fees and costs, and all other appropriate damages, remedies and other relief available under the TPPA and all other state statutes providing for remedy for the aforementioned violations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks the Court:

1. That a trial by jury be held on all triable issues;

2. Judgment in favor of Plaintiff against Defendant on all Counts in this action;

3. Declaratory judgment that the practices complained of are unlawful and void;

4. Back pay and benefits to Plaintiff;

5. Front pay;

6. Compensatory damages exceeding $250,000;

7. Punitive damages in excess of $500,000;

8. Attorney's fees and expenses to Plaintiff;

9. Prejudgment interest and, if applicable, post-judgment interest; and

10. Such other and further legal and equitable relief to which Plaintiff may be entitled.

/s Brian C. Winfrey_____

Brian C. Winfrey (#025766)
MORGAN & MORGAN, PC
810 Broadway, Suite 105
Nashville, Tennessee 37215
(615) 601-1276 or (615) 473-3243

13

Case 3:17-cv-01513   Document 1   Filed 12/03/17   Page 13 of 13 PageID #: 13